IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

ERIKA PETERMAN,

Plaintiff,

vs.

REPUBLICAN NATIONAL
COMMITTEE,

Defendant.

CV 17–66–M–DLC

ORDER

Before the Court are the parties' cross-motions for summary judgment

(Docs. 31 & 37) and Plaintiff Erika Peterman's motion to compel (Doc. 54). The

Court grants the motion for summary judgment of Defendant Republican National

Committee ("RNC"), denies Peterman's partial motion for summary judgment on

the merits, and denies Peterman's motion to compel as moot.

**FACTUAL AND PROCEDURAL BACKGROUND**

In the spring of 2017, Peterman contracted with the Montana Democratic

Party ("MDP") to take photographs on March 18, 2017 at the Mansfield-Metcalf

Dinner, an annual Democratic fundraising event. (Doc. 28 at 4.) For a $500 fee,

Peterman photographed the event. (Doc. 28 at 4.) Several of the photos feature

Rob Quist, a singer-songwriter and then-Democratic candidate for Montana's lone

seat in the House of Representatives. (Doc. 33-2.) One of the photos (referred to

as the "Work") shows Quist neck-up from behind, his cowboy hat slightly illuminated, with three stage lights in the distance. (Doc. 1-1.)

Peterman edited the photos and shared them with the MDP on March 21, 2017. (Doc. 28 at 5.) Peterman retained ownership of the pictures, granting unrestricted royalty-free licenses to the MDP and the Quist Campaign for no additional fee. (Doc. 28 at 6.) As licensees, both the MDP and the Quist Campaign posted the Work to Facebook without including any photographer attribution or copyright information. The MDP posted the Work without a caption and as part of a series of images from the Mansfield-Metcalf Dinner, and the Quist Campaign posted the Work as a stand-alone image, captioned with an invitation to a public lands rally. (Doc. 33-7 at 6.)

On May 9, 2017, Peterman learned that an independent expenditure unit of the RNC had issued mailers appropriating the Work and criticizing Quist to bolster the campaign of his Republican opponent, Congressman Greg Gianforte. The vendor that prepared the mailer on the RNC's behalf had downloaded the photo as a high-resolution image directly from the Quist Campaign's Facebook page. (Doc. 33-5.) No copyright information or photographer credit was included on the Facebook post, and the parties agree that it would have been reasonable for the RNC to assume that the Quist Campaign owned the Work. (Doc. 40 at 7–8.)

The mailer includes three images of Quist, all of which the RNC's vendor found on the Quist Campaign's Facebook page.[1] On the front panel, next to the address block, Quist stands in front of a microphone holding a guitar and wearing a bolo tie, leather vest, and what appears to be the same cowboy hat worn in the Work. (Doc. 28-1.) A treble clef appears at the top of the panel, with the words "Tell Liberal Rob Quist: / It's Time to Face the Music" over the adjacent music staff. (Doc. 28-1.) Inside the mailer is a photoshopped image of Quist playing guitar and singing, dressed in the same outfit and hat as on the front panel, accompanied by current House Majority Leader Nancy Pelosi on accordion. (Doc. 28-1.) At the top of the page, a treble clef precedes a staff over which is written "Liberal / Rob Quist / Music to Nancy Pelosi's Ears." (Doc. 28-1.) Text appears in the same style at the bottom of the page, with music notes in place of the treble clef. (Doc. 28-1.) There, the text reads, "Rob Quist & Nancy Pelosi / Singing the Same Tune." (Doc. 28-1.) Finally, the Work covers the back panel. (Doc. 28-1.) It is cropped slightly, and light streams down from the stage lights, a variation from the original. (Doc. 28-1.) The same treble clef and staff cover the bottom left corner of the panel, reading, "For Montana Conservatives, / Liberal Rob Quist / Can't Hit the Right Note." (Doc. 28-1.)

---

[1] In addition to the Work, the mailer includes two screenshots from a video posted to the Facebook page. (Doc. 33-5 at 4.) The other two images are not at issue in this litigation.

On May 12, 2017, Peterman registered the Work with the Copyright Office. (Doc. 28 at 6.) She filed her Complaint on May 16, 2017, alleging copyright infringement and intentional interference with economic advantage. (Doc. 1.) On March 19, 2018, this Court granted in part and denied in part the RNC's motion to dismiss, dismissing Peterman's claim for intentional interference with economic advantage and allowing the copyright infringement claim to proceed. (Doc. 19.)

## LEGAL STANDARD

Where, as here, "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citation, quotation marks, and alteration omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of proving the absence of a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If that burden is met, the non-moving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." *Id.* at 257. When the evidence could support a jury verdict for either party, there exists a material factual dispute, and summary judgment is inappropriate. *Id.*

"Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). However, "[i]f there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work." *Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148, 1151 (9th Cir. 1986).

## DISCUSSION

The parties do not dispute that Peterman owns the Work and that the RNC reproduced and distributed the Work, establishing Peterman's prima facie case of copyright infringement. *See Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799 (9th Cir. 2003). The RNC argues that it is nonetheless entitled to summary judgment because the evidence establishes the affirmative defense of fair use. In the alternative, the RNC seeks partial summary judgment on the issues of willfulness and the measure of damages, contending that Peterman cannot recover more than a single award of statutory damages. Peterman does not address the statutory damages issue, ostensibly conceding that she is not entitled to an award of statutory damages for each individual mailer. Instead, she argues that she is entitled to partial summary judgment as to fair use and that the issue of willfulness should proceed to trial.

The Court agrees with the parties that there is no genuine dispute of material fact bearing on the fair use inquiry. Because it finds that the relevant factors weigh in favor of fair use, it grants the RNC's motion for summary judgment and does not reach the remainder of the issues.

"[T]he fair use of a copyrighted work, including such use by reproduction . . . for purposes such as criticism[] [or] comment . . . is not an infringement of copyright." 17 U.S.C. § 107. By statute, courts must consider four factors in determining whether a use is "fair":

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Fair use "permits the use of copyrighted works without the copyright owner's consent under certain situations," serving the goal of stimulating ingenuity and promoting the free exchange of ideas without sacrificing creators' rights to their work product. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007). The four statutory factors are "not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case

analysis." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (citations omitted).

## A.    Purpose and Character of the Use

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  Several principles may bear on this factor, including, as relevant here: transformation and commerciality.[2] *See Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir. 2012).

### 1. Transformation

Transformation, "a judicially-created consideration that does not appear in the text of the statute," *Monge*, 688 F.3d at 1173, has been described as "the most important component of the inquiry into the purpose and character of the use," *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938 (9th Cir. 2002) (citation omitted), *as amended*, 313 F.3d 1093 (9th Cir. 2002).  "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.

---

[2] The RNC argues that its good faith belief in the legality of its action and First Amendment free speech principles should be discussed within the first factor.  Good faith is relevant—if at all—to a fair use defense only to the degree that a party "abuse[s] . . . the good faith and fair dealing underpinnings of the fair use doctrine." *Perfect 10*, 508 F.3d 1146 n.8; *see also Monge*, 688 F.3d at 1173 n.6.  Peterman has not argued that RNC's bad faith estops it from raising the fair use defense, and so the RNC's good faith is not at issue.  The First Amendment is incorporated into the § 107 factors, as discussed elsewhere in this Order, and does not present an additional layer of protection for unauthorized uses of a copyrighted work. *See infra* p. 13–14 & n.4.

A work is transformative when it does not "merely supersede the objects of the original creation" but "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 579 (internal quotation marks, alteration, and citation omitted). The question is whether the appropriation of the original leads to a "new creation," either through changes to the work itself or through placement of the work in "a different context." *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006). Even an exact copy of a work may be transformative if "the copy serves a different function than the original work." *Perfect 10*, 508 F.3d at 1165 (use of thumbnail images in search engine).

The RNC argues that its use is transformative both because it altered the original and because, in the context of the mailer, the nature of the Work changed. The RNC made two minimal alterations to the Work,[3] cropping it to fit the mailer and adding a soft stream of light from the three stage lights shining at Quist. (*Compare* Doc. 1-1 *with* Doc. 28-1.) These alterations are not, on their own, sufficiently transformative to find for the RNC. The cropping is irrelevant. The RNC merely did away with black space in the image so that it would fill the back panel of the mailer. The added glow of light is somewhat closer to transformative,

---

[3] The RNC did not itself design the mailer, using services provided by a vendor, Majority Strategies, which is not a party to this lawsuit. The Court refers to the RNC for the sake of simplicity, as RNC's potential liability for issuing the mailers designed by Majority Strategies is not at issue.

but it is too subtle to alter the function of the Work. Indeed, to the degree that the addition alters the Work, it intensifies the feeling of the original, playing up Quist's background as a musician.

More significantly, the RNC added a treble clef and text critical of Quist to the bottom-left corner of the image, repeating a visual theme used throughout the mailer. On its own, this alteration would not be enough to render the use transformative. In its Order on the RNC's motion to dismiss, the Court did not have the entire mailer before it—only the back panel appropriating the Work. At that stage of litigation, the Court determined that this addition was not sufficiently transformative.

The Court now has the mailer before it, and the RNC's context-based argument requires further examination. The mailer uses Quist's musicianship to criticize his candidacy, subverting the purpose and function of the Work. With the addition of the treble clefs and text throughout, the mailer attempts to create an association between Quist's musical background and liberal political views. In the context of the mailer, the image from the Mansfield-Metcalf Dinner is tied to the images of Quist on the front and interior panels; Quist even appears to be wearing the same clothes throughout, suggesting that Quist is giving a single musical performance. On the front panel, a serious-looking Quist holds his guitar. In the center of the mailer, he and Pelosi are playing side by side. On the back panel,

Quist is isolated on stage, lights shining down, conveying a sense of stark emptiness and suggesting that there is no connection between the musician and the unseen audience. In this context, the image takes on a new meaning.

In light of the mailer's clearly critical messaging, the Court finds that the RNC's use "alter[ed] [] the expressive content or message of the original work." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013). Although the RNC "ma[de] few physical changes" to the Work, "new expressive content or message is apparent," satisfying the transformation inquiry. *Id.*

The question is not, as both parties suggest to some degree, what Peterman and the RNC subjectively intended to convey through Peterman's creation and the RNC's use of the image. Peterman argues at length that her intent was not to advance Quist's candidacy but only, in her words, "to highlight [Quist's] duality as a political candidate and performing artist." (Doc. 38 at 16.) She claims that the RNC shared Peterman's intent because it, too, wanted to associate Quist's musicianship with his candidacy. Although the Court is skeptical of Peterman's asserted indifference to whether her photo (licensed royalty-free to the Quist campaign) depicted Quist positively, there is, perhaps, a factual dispute as to whether Peterman was motivated by her political beliefs.

However, that factual dispute is not material and does not affect the analysis under the first factor, which focuses on the "purpose and character of the *use*," not

the creator's purpose in creating the original work. 17 U.S.C. § 107(1) (emphasis added.) Further, a "difference in purpose is not quite the same thing as transformation . . . ." *Monge*, 688 F.3d at 1176 (quoting *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998)). A new purpose "by itself, does not necessarily create new aesthetics or a new work that alter[s] the first [work] with new expression, meaning or message." *Id.* (alteration in original) (internal quotation marks and citation omitted). Regardless of the parties' intent, the Court finds that the placement of the image in the mailer changed the function and meaning of the Work by connoting a critical message not inherent to the Work itself.

Peterman argues that, as a matter of law, transformation cannot be found under *Monge v. Maya Magazines, Inc.*, a "telenovela" of a case "pit[ting] music celebrities, who make money by promoting themselves, against a gossip magazine, that makes money by publishing celebrity photographs, with a paparazzo, who apparently stole the disputed pictures, stuck in the middle." 688 F. 3d at 1168. In *Monge*, two Latin American celebrities documented their secret Las Vegas wedding through a series of photographs, including images of the wedding ceremony and of the bride in her underwear on the wedding night. *Id.* at 1169. A paparazzo allegedly stole the images and sold them to a Latin American tabloid, which ran them in their cover story. *Id.* The photos were not altered in any way,

and the story was written as an exclusive exposé of the undercover wedding, which the couple feared would interfere with the bride's marketability as a pop singer. *Id.* at 1168–69.

Applying the searching, "case-by-case" inquiry demanded under fair use doctrine, the Court cannot agree that *Monge* controls. *Harper & Row*, 471 U.S. at 561. In *Monge*, Court held that the tabloid's use was "at best minimally transformative," as the magazine neither "transform[ed] the photos into a new work . . . [nor] incorporate[d] the photos as part of a broader work." *Id.* at 1177. Here, the RNC's mailer cannot be dismissed as "wholesale copying sprinkled with written commentary." *Id.* The RNC's use was strictly in furtherance of its criticism of Quist's candidacy.

In spite of the minimal alterations made to the Work itself, viewing the RNC's use of the Work within the broader context of the mailer, the Court determines that the RNC's use was transformative.

### 2. Commerciality

By statute, relevant to the first fair use factor is the issue of whether the RNC's "use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Peterman concedes that "[c]ourts have considered campaign advertisements in the fair use context as noncommercial." (Doc. 38 at 20.) Indeed, she cites to no case in which a political advertisement was classified as

-12-

"commercial" under § 107(1). *See, e.g., MasterCard Int'l Inc. v. Nader 2000*

*Primary Comm., Inc.*, 2004 WL 434404, at \*12 (S.D.N.Y. 2004) (finding

advertisement on behalf of Ralph Nader's presidential run to be noncommercial);

*Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp. 2d 682, 697 (N.D. Ohio 2002)

("[A politician's] solicitation of contributions [via internet advertisements] . . . is

properly classified not as a commercial transaction at all, but completely

noncommercial."); *Keep Thomson Governor Comm. v. Citizens for Gallen Comm.*,

457 F. Supp. 957 (D.C.N.H. 1978) (finding political ad appropriating snippet of

opponent's political ad to be noncommercial).

The mailer was "clearly part of a political campaign message,

noncommercial in nature." *Keep Thomson Governor Comm*, 457 F. Supp. at 961.

The distinction between commercial speech and political speech is frequently

discussed in First Amendment law, with the latter category of speech receiving the

highest level of protection and the former being more susceptible to regulation.

*Compare Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)

("Laws that burden political speech are subject to strict scrutiny . . . .") (quotation

omitted), *with Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S.

557 (1980) (announcing intermediate scrutiny test for commercial speech). It

makes sense that fair use doctrine respects this distinction, as "copyright's purpose

-13-

is to promote the creation and publication of free expression." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003).[4]

Peterman nonetheless argues that "[t]he RNC profited from its use of the Work because it stood to gain publicity, voters, and campaign donations. If the RNC didn't stand to profit in some way from the use of the Work, it would have had no reason to use it." (Doc. 38 at 20.) As a preliminary matter, the RNC did not solicit campaign donations through the mailer. Moreover, self-interest is not equivalent to commerciality; if Peterman's proposed interpretation of commerciality were adopted, no use would be commercial.

The mailer's noncommercial purpose bolsters the RNC's position as to the first factor of the fair use inquiry. Considering both transformation and commerciality, the Court finds that the first factor weighs in favor of fair use.

## B. Nature of the Copyrighted Work

The second factor focuses not on the alleged infringer's use but on the "nature of the copyrighted work" itself. 17 U.S.C. § 107(2). "[C]reative works are 'closer to the core of intended copyright protection' than informational and

---

[4] The RNC asks the Court to go several steps further, arguing that its use of the Work to further a political message is entitled to First Amendment protection above and beyond that built into the Copyright Act. However, the fair use defense is itself a "built-in First Amendment accommodation," and the RNC cites to no precedent supporting its position that the First Amendment demands an additional layer of protection. *Eldred*, 537 U.S. at 219; *see also Harper & Row*, 471 U.S. at 558 ("[T]he Framers intended copyright itself to be the engine of free expression.").

functional works . . . ." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997) (quoting *Campbell*, 510 U.S. at 586).

In its Order on the RNC's motion to dismiss, the Court concluded that this factor weighs against fair use. Additional factual development changes the analysis, and the Court now finds the factor inconclusive.

The photograph was published prior to its use in the mailer, which strengthens the RNC's claim to fair use. *See Harper & Row*, 471 U.S. at 564 ("[T]he scope of fair use is narrower with respect to unpublished works."). The details of that publication further improve the RNC's position. Not only was the photograph published, but it was posted to both the MDP's and Quist Campaign's public Facebook pages,[5] where no copyright information or photographer attribution was listed. Peterman herself posted the Work to Twitter, captioned with a Teddy Roosevelt quote and the hashtags #resist #RobQuist #Montana #vote #montanaspecialelection. (Doc. 49 at 25.) Any internet user could, as the RNC's vendor did, download a high-quality version of the image. And, absent a complete suspension of common sense, it must be assumed that the MDP, Quist Campaign, and Peterman herself would have welcomed reposts, retweets, and other forms of

---

[5] Peterman suggests that the Court should turn a blind eye to the use of the photo by the MDP and the Quist Campaign because she owns the Work and they merely had a license to use the Work. She also states—without any legal or factual support—that the license given to the MDP and the Quist Campaign was exclusive. (*See* Doc. 38 at 8). However, the public distribution of the image by the MDP and the Quist Campaign is relevant to the "value of the materials used." *Campbell*, 510 U.S. at 586 (quoting *Folsom v. Marsh*, 9 F. Cas. 342 (C.C.C.D. Mass. 1841) (no. 4,901)).

appropriation by other pro-Quist social media users. This, after all, is the purpose of sharing an image on a social media platform.

However, on the other side of the equation, the Work is at least as creative as it is informative. The RNC contends that Peterman's photos were purely informative, as she contracted with the MDP to document the Mansfield-Metcalf Dinner. Peterman argues that the framing and composition of the Work demonstrate that it an artistic work. Both parties are partially correct. Although the Work is functional, it is also unequivocally creative. *Compare Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 ("In assessing the 'creative spark' of a photograph, we are reminded of Judge Learned Hand's comment that 'no photograph, however simple, can be unaffected by the personal influence of the author.'") (quoting *Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y 1921), *with Galvin v. Ill. Republican Party*, 130 F. Supp. 3d 1187, 1195 (N.D. Ill. 2015) ("This Court need only inspect the Photograph to characterize it as a candid image taken of a politician at a political even and primarily factual in nature.") (internal quotation marks, alteration, and citation omitted). More than a simple snapshot of a political candidate speaking at a campaign event, the creative decisions made by Peterman push the Work "closer to the core of intended copyright protection." *Campbell*, 510 U.S. at 586.

Considering both the publication of the Work and the creativity reflected in the image, the Court determines that the "nature of the copyrighted work" weighs neither for nor against fair use.

## C.    Amount and Substantiality of Portion Used

The third factor in the fair use inquiry is the "[t]he amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). In assessing the amount and substantiality of portion used, courts consider not only "the quantity of the materials used" but also "their quality and importance." *Campbell*, 510 U.S. at 587. While "'wholesale copying does not preclude fair use per se,'" copying an entire work 'militates against a finding of fair use.'" *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (quoting *Hustler Magazine*, 796 F.2d at 1155).

If the subsequent user of the work "only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003). Thus, the use of an entire image may be reasonable if a more limited use would not serve the defendant's intended purpose. *See Perfect 10*, 508 F.3d at 1167–68 (finding use of entire image necessary when the defendant used the image in its search engine).

In its Order on the RNC's motion to dismiss, the Court determined that the RNC copied essentially the entirety of the Work. Further factual development

-17-

does not change the Court's analysis. As discussed under the first factor, the RNC made minimal changes to the image before sending out the mailer. If anything, the RNC's contention—that it could not reasonably appropriate part of the image and retain the meaning it wished to convey—actually strengthens Peterman's position. *See Harper & Row,* 471 U.S. at 565 ("[T]he fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression."). The Work is not an iconic image associated with the Quist Campaign, and the RNC could have made its point as effectively without incorporating the Work into its mailer.

The third factor weighs against fair use.

## D. Effect on the Market

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. 107(4). It is "undoubtedly the single most important element of fair use" because it strikes at the heart of the policy served by the Copyright Act. *Harper & Row*, 471 U.S. at 566–67. "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984).

-18-

Ultimately, the fourth factor asks whether the use serves a "different market function" than the original. *Campbell*, 510 U.S. at 591. Courts "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (1994) (internal quotation marks, alteration, and citation omitted).

Here, the undisputed facts demonstrate that the RNC's use did not and will not interfere with Peterman's ability to profit from the original Work. The burden of establishing each factor of the fair use defense falls on the party asserting the defense, presenting a challenge for the defendant, who must demonstrate the nonexistence of a market for the original. *See Campbell*, 510 U.S. at 590. That said, "although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter." *Sony Corp.*, 464 U.S. at 451; *see also Hustler Magazine*, 796 F.2d at 1156 (finding fourth factor satisfied where "[a]lthough Defendants used the [work] for a commercial purpose in the sense that they profited from copying it, they did not actually sell the copies to willing buyers" but instead to "generate moral outrage . . . and thus stimulate monetary support for their political cause").

Peterman received the entirety of her $500 fee to photograph the Mansfield-Metcalf Dinner. With Peterman's permission and pursuant to an agreement that Peterman would receive no additional fee for their use of the Work, the Quist Campaign and the MDP made the Work available for download on Facebook without including any photographer attribution or copyright information. It is unclear how the Work could conceivably have any future commercial value to Peterman. The Work has no recognizable value outside of Quist's congressional campaign, and that value has been fully realized by Peterman.

Peterman's own arguments demonstrate the relative strength of the RNC's position on this factor. Peterman argues that "[i]t is possible [she] lost additional revenue from customers who might have licensed her images but did not do so because should could not guarantee the images' exclusivity. In addition, the Montana Democratic Party may not hire [her] in the future to shoot their events because she cannot guarantee her images' exclusivity." (Doc. 38 at 24.) However, the Copyright Act does not exist to protect artists' general reputations. No artist can guarantee exclusivity; every copyrighted work is subject to fair use. 17 U.S.C. § 106 (providing that exclusive rights in copyrighted works are subject to § 107).

What is more, the Supreme Court has considered and rejected the argument that the fourth factor is satisfied when the original work loses value due to criticism. Copyright law recognizes the difference between "potentially

remediable displacement and unremediable disparagement." *Campbell*, 510 U.S. at 592. For example, "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Id.* at 591–92. "[T]he role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps it." *Id.* at 592 (citation, quotation marks, and alteration omitted). Thus, even in the unlikely situation that the Work's value to Peterman had decreased because of the RNC's use, any decrease in value is not displacement.

Thus, the fourth and most important factor of the fair use inquiry supports a finding of fair use. Weighing the four factors of the test, the Court determines that the undisputed facts establish that the RNC is entitled to judgment as a matter of law. The third factor—the amount and substantiality of the portion used—weighs against fair use. The second factor supports neither party, as the original work was both creative and freely available online. However, the other two factors are determinative. The RNC's use was moderately transformative and wholly noncommercial, and it performed a different market function than did the original.

Because RNC is entitled to summary judgment on its fair use defense, the Court does not reach the issue of willfulness, and it denies as moot Peterman's motion to compel, which is relevant only to that issue.

Accordingly, IT IS ORDERED that Defendant's Motion for Summary

Judgment (Doc. 31) is GRANTED, and Plaintiff's Motion for Partial Summary

Judgment (Doc. 37) is DENIED. Plaintiff's Motion to Compel (Doc. 54) is

DENIED as moot.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment of

dismissal by separate document and shall close this case.

DATED this 22ⁿᵈ day of February, 2019.

Dana L. Christensen, Chief Judge
United States District Court